Heidi J. Sorvino, Esq.
James C. Vandermark, Esq.
(Bar No. PA306944)
**WHITE AND WILLIAMS LLP**
7 Times Sq., Suite 2900
New York, NY 100036
Tel: 212-244-9500
Fax: 212-244-6200
sorvinoh@whiteandwilliams.com
vandermarkj@whiteandwilliams.com

*Proposed Counsel for Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>TRACER ROOFING LLC,<br><br>Debtor. | Case No. 22-30314 (JPN)<br><br>Chapter 11 |

### DECLARATION OF NICOLE CARPENTER IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, Nicole Carpenter, hereby declare under penalty of perjury:

1. On February 3, 2022 (the **"Petition Date"**), Tracer Roofing LLC (the "**Debtor**") commenced a case under the provisions of Title 11, Chapter 11 of the United States Code (the **"Bankruptcy Code"**) in this Court.

2. As of the Petition Date, I am the Managing Member of the Debtor. As such, I am familiar with the Debtor's books, records, loan documents, and financial statements and have personal knowledge of the information contained herein. I submit this declaration to assist the Court and parties in interest in understanding the circumstances compelling the commencement of this Chapter 11 case and in support of the Debtor's Chapter 11 petition and certain motions and applications filed today.

28415536v.6

-2-

3. Except as otherwise indicated, all facts in this declaration are based upon my personal knowledge, my discussions with the Debtor's management team and advisors, my review of relevant documents and information concerning the Debtor's operations, financial affairs, or my opinions based upon my experience and knowledge. I am over the age of eighteen and authorized to submit this declaration on behalf of the Debtor. If called upon to testify, I could and would testify competently to the facts set forth in this declaration.

**PRELIMINARY STATEMENT**

4. As set forth in detail herein, the Debtor commenced this Chapter 11 case to preserve and maximize the Debtor's remaining assets and business value for the benefit of its stakeholders in the face of impending liquidity shortfall and significant industry headwinds caused, in part, by the adverse impacts of the COVID-19 pandemic.

5. Founded in Arizona in 2017, the Debtor operated a construction business focused on residential and commercial roofing, re-roofing, and roof repair solutions. The Debtor quickly became sought after for its roofing expertise and superior customer service, which allowed it to expand its business. At the beginning of 2020, the Debtor had over 50 construction projects in Arizona as well as hundreds of additional construction projects in Texas, Colorado, and Florida.

6. Since March 2020, the global COVID-19 pandemic has significantly and adversely affected the Debtor. Not only were the Debtor's projects shuttered to comply with months-long state and local government shutdown orders, but the construction industry faced unprecedented labor and material shortages. Additionally, material suppliers did not honor lock-in pricing due to alleged Force Majeure. As such, material costs exceeded all bids on jobs, leaving the Debtor with a severe monetary deficit. These factors drove up the cost of projects,

-2-

which became increasingly problematic for existing construction contracts that had been based on pre-pandemic cost estimates.

7. As of the Petition Date, the Debtor continues to operate its business and manage its assets as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No party has requested the appointment of a trustee or examiner in these Chapter 11 cases and no committees have been appointed or designated at this time.

8. Concurrent herewith, the Debtor is filing certain applications, motions and proposed forms of order (collectively the **"First Day Motions and Applications"**) as further described below.

## BACKGROUND AND EVENTS LEADING TO CHAPTER 11 FILINGS

**I.      THE DEBTOR'S BUSINESS**

**A.      The Debtor's Structure and Operations**

9. I founded the Debtor's construction and roofing business in 2017 in Phoenix, Arizona. As demand grew, the Debtor became sought after for its expertise and the quality of its work. The Debtor increasingly was engaged for projects all across Arizona and Texas. Over the next few years, the business continued to expand and the Debtor eventually began to handle projects in Colorado, and Florida.

   *i.   Arizona*

10. Since its founding, the Debtor has maintained an office and facilities in Arizona. The Debtor entered into a lease for the premises located at 2330 West Mission Lane, Suite 14-15, Phoenix, Arizona (the "**Arizona Premises**"). This location was historically used for business management. The term of the lease for the Arizona Premises continues through and including December 31, 2023.

11. Prior to January 22, 2022, the Debtor employed a number of individuals as part of its labor operations in Arizona. This included seven salaried employees as well as 28 full-time and part-time hourly employees.

### ii. Texas

12. Since 2017, one of the largest areas of growth for the Debtor's busines has been projects in Texas. This led the Debtor to enter into a commercial sublease for the premises located at 1714 Rotary Drive, Humble, Texas 77338 (the "**Texas Premises**"), which was historically used for business management. The term of the lease for the Texas Premises continues through and including June 30, 2022.

13. As of the Petition Date, I and my husband, Richard Carpenter, were the only salaried employees directly involved with the operations in Texas. The Debtor did not have any hourly employees in Texas. Instead, the Texas projects are primarily handled by non-employee subcontractors.

14. As of the Petition Date, there are approximately 20 projects that remain to be completed in Texas. Following the sale of the Arizona contracts (as discussed below), the projects in Texas are now the primary construction operations of the Debtor's business.

### iii. Colorado and Florida

15. Over the years, the Debtor was also able to expand its operations into Colorado and Florida. The Debtor never leased or owned property in either of these states and only employed one division manager and one superintendent. Similar to its operations in Texas, all of the projects in Colorado and Florida were completed by subcontractors.

16. The Debtor is not currently working on any construction projects in Colorado and does not possess any receivables; however, there remains two unfinished projects in Florida. I

-5-

estimate there is approximately $50,000.00 owed to the Debtor for work completed on projects in Florida. It is my intention to pursue collection of these receivables during these Chapter 11 proceedings.

B. **Capital Structure**

  i. *Long Term Debt*

17. On or about September 3, 2021, the Debtor entered into a Promissory Note (the "**ABC Note**") with ABC Supply Co., Inc. ("**ABC**") to resolve certain amounts owed to ABC for materials provided to the Debtor. The principal amount of the ABC Note was for $2,128,191.84, which was to bear interest at the rate of eight percent (8%) per annum.

18. Pursuant to the ABC Note, the Debtor was required to pay monthly installments of $185,128.06 commencing on September 20, 2021, and on the 20th day of each calendar month thereafter through August 20, 2022 at which time the remaining balance was to be paid. As of the Petition Date, ABC asserts that approximately $1,957,251.73 is outstanding on the ABC Note.

  ii. *SBA Loans*

19. On or about June 5, 2020, the Debtor applied for and received a $150,000.00 loan (the "**SBA Loan**") under the Economic Injury Disaster Loan Program ("**EIDL**") administered by the Small Business Administration (the "**SBA**") under the Coronavirus Aid, Relief, and Economic Security (CARES) Act, pursuant to that certain loan agreement (the "**SBA Loan Agreement**"). As of the Petition Date, $150,000.00 of the principal amount remains outstanding under the SBA Loan Agreement.

-5-

28415536v.6

### *iii.    MCA Debts*

20.    In early 2021, the Debtor began to enter into certain agreements (the "**MCA Agreements**") with parties (the "**MCA Companies**" and together with the SBA, collectively, the "**Lenders**") purportedly offering merchant cash advances for the Debtor's future receivables. At the time, the Debtor considered the advances provided by the MCA Companies as necessary to operate its business; however, it eventually became clear that the fixed automatic withdrawals required by the MCA Companies would further decimate the Debtor's financial condition.

21.    As Bloomberg News has reported, the merchant cash advance industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[1]  This industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy."[2]  As one of these brokers admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage.  There's no license you need to file for.  It's pretty much unregulated."[3]

22.    Many merchant cash advance companies prey upon cash-strapped businesses that cannot readily obtain financing from banks and other traditional lenders.  Although they purport to represent the sale/purchase of a business's future revenue, the MCA Companies market, underwrite and collect upon the transactions as loans, with interest rates far above those permissible under state law.

23.    In a state of desperation, the Debtor entered into numerous MCA Agreements – often entering into new agreements to pay off debts under older MCA Agreements.  As of the

---

[1]  Zeke Faux and Dune Lawrence, *Is OnDeck Capital the Next Generation of Lender or Boiler Room?*, BLOOMBERG (Nov. 13, 2014, 6:07 AM), https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.
[2] *Id.*
[3] *Id.*

28415536v.6

Petition Date, the Debtor has 30 MCA Agreements and the MCA Companies assert that at least $11 million is still owed under those agreements. The Debtor and the MCA Companies dispute the nature of the MCA Agreements and corresponding debt. While the MCA Companies have asserted they purchased future receivables, the Debtor contends that they are truly loans subject to interest rates exceeding the amount permitted under state law. It is anticipated that the Debtor will bring claims against the MCA Companies in these proceedings to, amongst other things, address these disputes. As such, the debts owed to the MCA Companies are disputed, contingent and unliquidated.

### C.     The Debtor's Tax Liabilities

24.     The Debtor is a single member limited liability company which does not file or pay taxes at the federal level. Based on information and belief, the Debtor does not have any outstanding tax obligations as of the Petition Date.

### D.     The Debtor's Other Prepetition Indebtedness

25.     Aside from the aforementioned liabilities to ABC, SBA and the MCA Companies, the Debtor's primary liabilities consist of debts to vendors and other general unsecured creditors approximating $3.5 million. Some of these liabilities are disputed by the Debtors.

26.     The Debtor will file a motion to seek authority to use cash and other receipts generated in the ordinary course of the Debtor's business (the "**Cash Collateral**") to satisfy ongoing expenses. Funding each of these expenditures is necessary to preserve and maintain the value of the Debtor's assets for the benefit of all parties in interest. Absent the use of cash collateral, the Debtor will be unable to operate the Debtor's business and the Debtor's case may need to be converted to a case under Chapter 7.

28415536v.6

## II.    EVENTS LEADING TO CHAPTER 11

### A.    Impact of COVID-19

27. The Debtor's business is generally construction and primarily roofing and roofing repairs. As discussed above, the Debtor's reputation for quality work allowed it to expand its operations from its origins in Arizona to multiple other states. Prior to the COVID-19 pandemic, the Debtor flourished despite increased competition.

28. However, in response to the rapidly spreading COVID-19 pandemic and governmental shutdown mandates and other restrictions enacted by various states, the Debtor had to delay work on a number of its projects. The Debtor's business depends greatly on the payments received at the conclusion of each project to pay ongoing expenses, which includes retention held by the owner or general contractor. The Debtor was unable to invoice and/or collect retention and other payments during the time that it delayed finishing work on projects due to the COVID-19 pandemic. As a result, it fell behind on certain fixed costs, including the payments due under the leases for the Arizona Premises and Texas Premises as well as certain variable costs, including outstanding payment obligations owed to suppliers.

29. By the third quarter of 2020, the Debtor was able to restart the work on most of its projects; however, it quickly faced labor and material shortages. Some employees had found other opportunities while the Debtor's business was shuttered and others simply decided not to return to work. The employees that did return to work would often be unable to appear at job sites because of positive COVID-19 test results. Continuous labor issues caused additional significant delays and disruptions for the ongoing projects.

30. In addition, the costs of materials for projects increased dramatically in 2021. This was in large part due to supply chain issues also caused, in part, by COVID-19. This

created additional financial stress for the Debtor because it had entered into numerous contracts before the COVID-19 pandemic, which were based on outdated cost estimates. Most of these contracts were at fixed amounts, so when the material costs to finish projects increased, the Debtor's profits decreased.

31. The Debtor began to face significant financial challenges in the summer and fall of 2021, which necessitated entering into many of the MCA Agreements to simply keep the business operating. Even with the funds received from the MCA Companies, the Debtor was unable to pay for operating expenses as well as the substantial monthly payments required by the ABC Note. By the winter of 2021, the Debtor was also not able to maintain the daily withdrawals taken by the MCA Companies. This led to serious liquidity issues and concerns that the Debtor would not be able to make its payroll obligations.

### B. The Sale of Arizona Assets

32. In January 2022, it became clear that the Debtor could no longer continue to maintain its operations in Arizona. ABC and many of the MCA companies had already filed suits asserting breaches of their respective agreements. In addition, ABC, which had been the Debtor's primary supplier, refused to allow the Debtor to purchase any additional materials – even after the Debtor offered to pay in cash. The inability to obtain supplies to complete projects and increasing fear that it would not be able to make its payroll obligations led the Debtor to decide to sell its assets in Arizona.

33. On or about January 27, 2022, the Debtor entered into that certain Sale Agreement dated January 22, 2022 (the "**Arizona Sale Agreement**") with Tracer Roofing of Arizona LLC (the "**Arizona Purchaser**"). Pursuant to the Arizona Sale Agreement, the Arizona Purchaser acquired substantially all of the Debtor's assets in Arizona, including all construction

contracts for projects in Arizona and all accounts receivable related to the Arizona projects (the "**Arizona AR**"). In return, the Arizona Purchaser agreed to pay $35,000 and remit to the Debtor the net balance of the Arizona AR that the Arizona Purchaser collected minus certain material and vendor costs.

34. The sale of the Debtor's Arizona assets allowed the Debtor to avoid the inevitable diminishment of those assets that would have been caused by the Debtor's inability to pay its employees or finish the projects. In addition, the Debtor may still reap some benefit from the work already completed on the Arizona projects as a result of any remittance by the Arizona Purchaser. I estimate that the value of the Arizona AR, net of existing costs, could be as much as $300,000.00.

35. The sale of the Arizona assets also allowed the Debtor to eliminate much of its future payroll concerns. Following the acquisition by the Arizona Purchaser, the only employees remaining on the Debtor's payroll are myself and my husband, Richard Carpenter. The Debtor's primary focus going forward will be to complete its projects in Texas, collect the outstanding receivables, and address certain claims against the MCA Companies and other creditors.

36. Despite many challenges, the Debtor is committed to maximizing the value of its assets for its stakeholders. I believe it is in the best interest of the Debtor's estate and creditors that the Chapter 11 petitions be filed and that the Debtor continue to operate under the auspices of Chapter 11.

### III. FIRST DAY MOTIONS

37. Concurrently herewith, the Debtor is filing the following applications, motions and proposed Orders:

**A.** **Expedited Consideration of Application to Retain White and Williams LLP as Debtors' Counsel**

38. The Debtor has determined that it will be necessary to engage counsel with knowledge and experience in the areas of bankruptcy, litigation, corporate, and tax law. Such legal counsel will enable the Debtor to fulfill its duties in these Chapter 11 proceedings and will assist in the reorganization of the Debtor's estate. The Debtor proposes to retain the law firm of White and Williams LLP (**"W&W"**) as lead counsel in these Chapter 11 cases.

39. The Debtor seeks authority to engage W&W as bankruptcy counsel because W&W and the attorneys thereof who have been assigned to this engagement have considerable experience in Chapter 11 reorganization cases and fields of debtors' and creditors' rights and litigation involving merchant cash advances. In particular, Heidi J. Sorvino, Esquire who will serve as Debtors' lead bankruptcy counsel, has considerable knowledge of the construction industry, including prior experience in construction bankruptcy cases. In connection with services rendered prior to the Petition Date, including preparation for the commencement of these Chapter 11 cases, W&W has become familiar with the Debtor's circumstances and financial affairs.

40. W&W has the necessary background to deal effectively with the many legal issues and problems that may arise in the context of the Debtor's Chapter 11 case, and is well-qualified and uniquely able to represent the Debtor in this Chapter 11 case in an efficient and timely manner.

41. For the foregoing reasons, and as more fully set forth in the *Application for Authorization to Retain White and Williams LLP as Attorneys to the Debtors and Debtors-in-Possession* and in the supporting Affidavit of Heidi J. Sorvino, Esquire, the Debtor believes that the retention and employment of W&W in connection with this Chapter 11 case is in the best

interests of the Debtor, its creditors, and all parties in interest, and should be approved in all respects.

B. **Emergency Motion for Authorization to Pay Prepetition Wages and Compensation**

42. As discussed above, in the ordinary course of business, the Debtor incurs payroll obligations to approximately two (2) employees for the performance of services in connection with the Debtor's operations.

43. The employees are critical to the Debtor's continued operations and consequently to the reorganization efforts. Indeed, even a relatively minor disruption in the Debtor's ability to pay its employees as a result of the filing of this Chapter 11 case will create an immediate and severe threat to the Debtor's ability to continue its operations, not to mention personal hardship to Debtor's employees. Moreover, any disruption of the Debtor's ability to retain the employees could adversely affect the level of service rendered to the Debtor's customers, potentially jeopardize the Debtor's remaining projects, and undercut the ability to recover outstanding receivables. Accordingly, as described in more detail below, the Debtor is requesting authority to honor and pay prepetition wages, salary, tax obligations, vacation obligations, and related obligations, as such obligations become due in the ordinary course of the Debtor's business.

44. Prior to the Petition Date, the Debtor paid employees and subcontractors on a weekly pay cycle in arrears. The Debtor is required by law to withhold from their payrolls, and remit to the appropriate tax authorities, certain federal, state and local income taxes, social security and Medicare taxes (collectively, the **"Payroll Tax Obligations"**) and (ii) directly pay state and local unemployment taxes and contributions (**"Unemployment Taxes"**). The Debtor's average weekly gross payroll prior to executing the Arizona Sale Agreement was approximately $75,000.00. I estimate that the weekly gross payroll after the Petition Date will be $6,000.00,

28415536v.6

including wage and salary obligations (the **"Wage and Salary Obligations"**), plus the Payroll Tax Obligations and Unemployment Taxes (collectively, the **"Compensation Obligations"**), and payments to the subcontractors.

45. Prior to the Petition Date, the Debtor engaged the services of ADP, LLC ("**ADP**") to manage its Payroll Tax Obligations and Unemployment Taxes. The cost of ADP's services is $500.00 per month.

46. Under the Debtor's payroll system, Compensation Obligations owed to employees, or required to be paid on their behalf, were last paid by the Debtor on January 28, 2022. The Debtor is requesting authority to pay accrued and unpaid Compensation Obligations since January 28, 2022, which I estimate to be $6,000.00, and as they come due in the ordinary course of the Debtor's business practices.

C. **Emergency Motion for Entry of Interim and Final Orders Authorizing Use of Cash Collateral**

47. The Debtor has filed a motion seeking authority to use cash and other receipts generated in the ordinary course of the Debtor's business to satisfy ongoing expenses, including payments to subcontractors completing the projects in Texas. Funding each of these expenditures is necessary to preserve and maintain the value of the Debtor's assets for the benefit of all parties in interest. Absent the use of cash collateral, the Debtor will be unable to operate the Debtor's business and the Debtor's case may need to be converted to a case under Chapter 7.

48. Upon information and belief, the Lenders are the only entities that may hold interests in the Cash Collateral. Allowing the Debtor to use the Cash Collateral is in the best interests of both the Debtor and the Lenders, because the Debtor will be unable to complete projects and collect unpaid receivables without the use of Cash Collateral.

28415536v.6

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct and respectfully request that all of the First Day Orders be entered.

Dated: February 7, 2022

*Nicole Carpenter*
Nicole Carpenter

28415536v.6