IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| IN RE:<br><br>TRACER ROOFING, LLC<br><br>      Debtor. | Case No.: 22-30314-7 |

**DECLARATION OF SHANE R. HESKIN IN SUPPORT OF WHITE AND WILLIAMS LLP'S RESPONSE TO TRUSTEE'S MOTION FOR TURNOVER OF ESTATE PROPERTY AND DISGORGEMENT OF ATTORNEY'S FEES**

      **SHANE R. HESKIN, ESQ,** hereby declares and affirms under penalty of perjury the following:

      1.      I am a partner at the law firm of White and Williams, LLP, attorneys in the above-captioned-action for Tracer Roofing, LLC ("Debtor").

      2.      I submit the instant Declaration in support of White and Williams LLP's Response to Trustee's Motion For Turnover of Estate Property and Disgorgement of Attorney's Fees.  Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein.

<u>**QUALIFICATIONS**</u>

      3.      I am the billing responsible partner for this matter.

      4.      I am admitted to practice law in Pennsylvania, Massachusetts and New York, and have been practicing law for over twenty years.

      5.      The vast majority of the debt at issue in this matter stems from predatory merchant cash advance ("MCA") loans issued by lenders out of New York.

28885517v.2

6.      In 2016, a family member of mine was victimized by numerous MCA lenders. Since that time, I have devoted thousands of hours of my personal time to expose these predatory practices and to prevent others from being victimized from the same predatory scheme.

7.      White and Williams LLP has been fully supportive of these efforts and the time devoted to this public service.

8.      Over the past five plus years, I have worked extensively with governmental agencies and regulators to combat the predatory practices of the MCA industry.

9.      Among these governmental and consumer protection groups, I have consulted with attorneys from the New York Attorney General, the New Jersey Attorney General, the Massachusetts Attorney General, the Securities and Exchange Commission, the Department of Justice, the Manhattan District Attorney's Office, and the Federal Trade Commission.

10.     On June 26, 2019, I testified before Congress concerning the MCA industry's predatory and abusive collection tactics.  *See https://smallbusiness.house.gov/uploadedfiles/06-26-19_mr._heskin_testimony.pdf*.

11.     Since 2016, I have represented several hundred victims of the MCA industry located all across the country and am widely considered an expert in the field.

## REASONABLENESS OF THE FEES INCURRED

12.     As demonstrated more fully below, White and Williams spent extensive time and resources on this matter beginning as early as April 3, 2021.  The time currently in our billing system is at least $254,299.  To date, White and Williams has applied a mere $180,291 to its bills.

13.     In total, I have personally sent and received well over 1,000 emails relating to this matter.   I have also had countless discussions with co-counsel, opposing counsel, and various other third parties relating to this matter.

28885517v.2

14.     My standard blended hourly rate for MCA matters is $575 for all billers.  This rate has been approved by at least two other bankruptcy courts, including within the Eastern District of Texas, Tyler Division.   *See* Exhibits A and B attached hereto.

15.     In total, all of the billers for White and Williams LLP have recorded 489 hours working on this matter.  At my standard billable rate for usury matters, that equates to a time value of $286,350.

16.     The time value in the system, however, is lower than the above amount because White and Williams LLP applied its bankruptcy rates to the individuals performing bankruptcy-related advice, and did not use a blended hourly rate for any matter relating to bankruptcy advice.

17.     In other words, the time billed for the bankruptcy-related work resulted in a lower hourly rate than my standard blended hourly rate for MCA work.

18.     As further explained below, I believe that the hours billed, and the fees charged to the Debtor in this matter, were reasonable and necessary.

## FACTUAL BACKGROUND

### A.     The First Retainer Agreement re:  Negotiation of MCA Debt

19.     Nicole Carpenter of Tracer Roofing first contacted me on April 5, 2021 to assist her with unwinding an MCA loan that charged exorbitant hidden fees and was using threats of extortion if Tracer Roofing did not pay.

20.     I exchanged at least 12 emails with Nicole Carpenter of Tracer Roofing to help her resolve her then dispute with Spartan Capital, which was threating to ruin her business if she did not capitulate to its extortionate demands.

21.     On August 3, 2021, Ms. Carpenter contacted me again to assist her with resolving her ballooning MCA loans, which were keeping Tracer Roofing afloat until its $5 million SBA

loan was funded.  According to Ms. Carpenter, Tracer Roofing had been pre-approved for a $5 million SBA loan but it was ultimately and unexpectedly denied.

22.     As a direct result of this denial, Tracer Roofing could not sustain the suffocating fixed daily payments required under the more than 20 MCA loans then existing, which were in excess of $600,000 to $800,000 to per month.

23.     At the time, Ms. Carpenter believed that the business was profitable but for the MCA debt, and represented that Tracer Roofing had run at a $1.6 million profit in 2020.

24.     In addition, I was informed that Tracer Roofing had over a billion dollars in contracts over the next 10 years, and that one builder would ramp up to $90 million in revenue over the next year and sustain the revenue for 10 years. This was expected to net a $9 million profit per year.  Ms. Carpenter also explained that it had about $70 million in contracts waiting to start.

25.     As a result of the historical success and number of profitable future contracts, Ms. Carpenter stressed that she did not want to file for bankruptcy at the time, and just needed to lower the payments on the MCA loans until she could obtain an investor to buy out the MCA loans and/or obtain other financing through the SBA or otherwise.  She also stressed that it was her strong desire to payback all of the principal she had received from the MCA companies.  But she did not believe she should be forced to pay the exorbitant and unlawful interest charged by the MCA companies, which exceeded interest rates of 100%.

26.     As a direct result of these stated goals, on August 4, 2021, White and Williams LLP entered into a retainer agreement (the "First Engagement Letter") with Tracer Roofing and Ms. Carpenter, wherein we agreed to negotiate settlements with over 20 MCA companies.  A copy of the First Engagement Letter is attached hereto as Exhibit C.

27.     The scope of the engagement was solely to negotiate settlements with all of Tracer Roofing's MCA lenders through either a payment plan and/or reduction of debt.

28.     Negotiating MCA debt is highly fact intensive and requires a detailed analysis of each agreement, the relevant bank statements, and correspondence by the parties.

29.     Many MCA agreements are shams designed to disguise the true nature of the transactions.  Although they purport to be sales of future receivables, the MCAs often know that the transactions cannot be what they purport to be because they are on notice of prior UCC liens, and prior MCAs that purport to purchase the very same receivables that are already subject to publicly filed UCC liens.  The MCAs also are often aware of the other MCA transactions by simply reviewing the bank statements prior to funding.

30.     As a direct result of these sham forms used by the MCA companies, numerous courts throughout the country have held that MCA transactions may be void because of their criminally usurious nature.  *See, e.g., Fleetwood Servs., LLC v. Ram Cap. Funding LLC*, 2021 U.S. Dist. LEXIS 94381 (S.D.N.Y. May 18, 2021) (upholding RICO claim on MCA transactions); *Fleetwood Servs., LLC v. Complete Bus. Sols. Grp.,* 374 F.Supp.3d 361 (E.D. Pa. 2019) (same); *NRO Boston v. Funding Metrics,* 2018 U.S. Dist. LEXIS 239152 (E.D.Pa. May 23, 2018) (same); *NRO Boston LLC v. Yellowstone Cap. LLC,* 2021 N.Y. Misc. LEXIS 1892 (Rockl. Cty, April 9, 2021) (sustaining RICO claims); *NRO Boston LLC v. CapCall LLC*, 2020 N.Y. Misc. LEXIS 4064, *6-7 (Sup. Ct. Westch. Cty. July 8, 2020) (same); *McNider Mar., LLC v Yellowstone Cap., LLC,* 2019 N.Y. Misc. LEXIS 6165 (Erie Cty, Nov. 19, 2019) (same); *Funding Metrics, LLC v. NRO Boston, LLC,* 2019 N.Y. Misc. LEXIS 4878 (Westch. Cty. Aug. 18, 2019) (holding MCA agreements were loans as a matter of law).

31.     I was counsel of record in every one of the cases cited above.

-5-

32.     In addition, in a more recent case that I argued before New York's highest court, the validity of these so-called MCA agreements was called into question:

> Although the GTR and CMS agreements are described as "factoring" agreements, they do not bear several of the hallmarks of traditional factoring arrangements, in that FutureNet did not sell any identifiable receivable to GTR or CMS; GTR and CMS did not collect any receivables; GTR and CMS received fixed daily withdrawals from FutureNet's bank account regardless of whether or how much FutureNet collected from or billed to its clients; and GTR and CMS did not bear the risk of nonpayment by any specific customer of FutureNet. The arrangements FutureNet entered with GTR and CMS appear less like factoring agreements and more like high-interest loans that might trigger usury concerns (*see Adar Bays, LLC v GeneSYS ID*, — NE3d —, 2021 NY Slip Op 05616 [2021]).").

*Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 2021 N.Y. LEXIS 2577, *45, 2021 NY Slip Op 07055, 11, 2021 WL 5926893 (N.Y. Dec. 16, 2021) (dissenting on unrelated question).

33.     New York appellate courts are in accord.  *See, e.g., Davis v. Richmond Cap. Gr.*, 194 A.D.3d 516 (1st Dep't. 2021) (upholding RICO claims for MCA agreements; *LG Funding LLC v. United Senior Properties of Olathe LLC,* 122 N.Y.S.3d 309 (2d Dep't. 2020).

34.     A recent bankruptcy court has also reached the same conclusion.  *See, e.g., CapCall, LLC v. Foster (In re Shoot the Moon, LLC)*, 2021 Bankr. LEXIS 2482, *27 (Bank. D. Mo. Sept. 10, 2021) ("CapCall's panoply of rights, remedies, and potential control is highly unusual in the context of an asset sale. Such an overall arrangement is consistent with a debtor-creditor relationship, not a seller-buyer relationship.").

35.     In addition to analyzing the individual facts of each of the 20-plus MCA agreements, the negotiation of these MCAs required extensive discussions with the client and opposing counsel for the MCAs.

36.     Given the amount of time it would take to analyze, negotiate, and settle each of these MCA agreements, I agreed to charge a flat fee of $5,000 per week with a total cap of $60,000 regardless of how long it took to resolve each of the MCA agreements.

37.     In addition to the flat fee, White and Williams would also be entitled to a fee equivalent to 40% of any reduction of debt obtained through settlement.  I agreed to cap this fee at $500,000 no matter how much debt was ultimately reduced.

38.     Given the amount of debt at issue and the number of MCAs involved, obtaining any reduction of debt was unlikely without the ability to make a lump sum payment.  Rather, what Tracer Roofing needed was extended terms and pauses in payments until other financing and/or investor funds could be obtained.

39.     From at least August 17, 2022 through September 17, 2021, I personally recorded 75 hours negotiating the various MCA settlements, analyzing the various agreements, and discussing the overall strategy with Ms. Carpenter.  During that period, I received at least 186 emails from Ms. Carpenter alone—which does not include the voluminous emails I had with the various MCA companies.  I also sent Ms. Carpenter nearly 150 emails during this time period.

**B.      The Second Retainer Agreement for Pre-and Post-Petition Bankruptcy Advice**

40.     By mid-to-late September 2021, Tracer Roofing still had not been able to procure additional investor financing or an SBA loan to maintain the business, although it was still exploring all options and had been assured that financing would be forthcoming.

41.     In an abundance of caution, White and Williams LLP entered into a second retainer agreement (the "Second Engagement Letter") with the Debtor to provide pre- and post-bankruptcy advice at our normal hourly rates.  A copy of the Second Engagement Letter is attached hereto as Exhibit D.

42.     In order to provide this advice, White and Williams LLP recommended retaining a financial specialist, CR3 Partners, to undertake an inspection of Tracer Roofing's records, contracts, bank statements and bookkeeping.

-7-

43.     On September 17, 2021, Tracer Roofing agreed to retain CR3 to perform the investigation that White and Williams LLP recommended.

44.     From September 17, 2021 through mid-October 2021, White and Williams LLP worked with CR3 to perform an investigation into Tracer Roofing's finances, books and records.

C.     **The Third Retainer Agreement for MCA Defense**

45.     On September 9, 2021, one of the MCAs, Newco LLC, filed an action in New York state court against Tracer Roofing and Ms. Carpenter personally.

46.     On October 19, 2021, another MCA company, Fresh Funding, also filed an action in New York state court against Tracer Roofing and Ms. Carpenter personally.

47.     The First Engagement Letter did not include the defense of any MCA actions filed against the Debtor or Ms. Carpenter.

48.     In order to defend Tracer Roofing and Ms. Carpenter against these actions, White and Williams LLP entered into a third retainer agreement (the "**Third Engagement Letter**"), dated November 17, 2021.  A copy of the Third Engagement Letter is attached hereto as Exhibit E.

49.     Although the subject line of the retainer is mislabeled "Pre- and Post-Petition Bankruptcy Representation," the body of the letter makes clear that the scope of the retention is to defend against any MCA action filed in New York, as well as file affirmative counterclaims.

50.     Upon execution of the Third Engagement Letter, I confirmed in writing with Ms. Carpenter that White and Williams LLP would no longer pursue any fees resulting from a reduction of debt and that its retention going forward would be straight hourly.

51.     Notably, I advised Ms. Carpenter that although business failure or the filing of bankruptcy is not supposed to be an event of default under the MCA agreements, many MCAs

ignore the words on the contract, and nonetheless, seek to hold the guarantor personally liable for the full amount due. *See, e.g.*, *Koch v Boxicon*, 2016 Tex. App. LEXIS 3274 at *18-9 (Tex. App. March 30 2016) (holding that a contract that purported to be an account purchase transaction, but which in fact imposed an absolute obligation to repay the principal and established a fixed payment schedule was in fact a disguised usurious loan); Robert D. Aicher & William J. Fellerhoff, *Characterization of a Transfer of Receivables as a Sale or a Secured Loan Upon Bankruptcy of the Transferor*, 65 Am. Bankr. L.J. 181, 186-94 (1991).

52.     On October 12, 2021, White and Williams LLP filed an answer on behalf of both the Debtor and Ms. Carpenter in the Newco action.  On November 11, 2021, White and Williams LLP filed an answer on behalf of both the Debtor and Ms. Carpenter.

53.     On January 11, 2022, Kingdom Kapital filed an action in New York against Tracer Roofing and Ms. Carpenter personally.  On February 8, 2022, White and Williams LLP filed an answer on behalf of both the Debtor and Ms. Carpenter.

54.     On January 12, 2022, AJ Equity filed an action in New York against Tracer Roofing and Ms. Carpenter personally.  On February 4, 2022, White and Williams LLP filed an answer on behalf of both the Debtor and Ms. Carpenter in the AJ Equity action.  On the same day, AJ Equity filed an Order seeking to Sever the action against Ms. Carpenter personally.

55.     On February 3, 2022, EIN Cap filed an action in New York against Tracer Roofing and Ms. Carpenter personally.  On February 8, 2022, White and Williams LLP filed an answer on behalf of both the Debtor and Ms. Carpenter in the AJ Equity action.

56.     On February 7, 2022, Kobalt Funding Solutions, LLC filed an action solely against Ms. Carpenter personally.  No answer was filed because Ms. Carpenter disputes proper service.  A default judgment was entered on April 4, 2022.  Despite the default judgment, I have been in

-9-

contact with counsel for Kobalt and have been assured that it is not taking steps to enforce the judgment.  In the event that Kobalt attempts to enforce the judgment, White and Williams LLP will contest the judgment on the basis of improper service, as well as usury, if directed to do so by Ms. Carpenter.

## AN OVERVIEW OF THE MCA INDUSTRY.

57.     A merchant cash advance is a form of non-traditional financing by which an MCA company purports on paper to purchase a merchant's future receipts at a discounted price.  The merchant then repays the MCA company through predetermined daily payments until the full face value of the purchased receipts has been repaid.  MCAs have been around in one form or another since the early 2000s, but they became a popular form of alternative financing for small businesses when banks and other traditional financial institutions tightened credit standards following the recession of 2008.  Unable to readily obtain credit from banks, small businesses desperate for cash became easy prey for MCA companies and the independent sales officers ("ISO") who brokered their deals.  Because MCA agreements, on paper, involve the purchase of future receipts and not the lending of money, the MCA industry is virtually unregulated.  Nonetheless, the differences between an MCA and a traditional factoring agreement have been noted.[1]

### A.     Distinguishing an MCA agreement from a legitimate factoring agreement.

58.     Traditional factoring has been around for centuries and its distinguishing factor is the transfer of risk.  *See Endico Potatoes v. CIT Group/Factoring*, 67 F.3d 1063, 1069 (2d Cir. 1995) ("The root of all of these factors is the transfer of risk.").  In contrast, the *sine qua non* of a loan is that the money advanced is absolutely repayable.  *See TIFD III-E, Inc. v. United States*,

---

[1] Mills, Karen Gordon and Brayden McCarthy, "The State of Small Business Lending: Innovation and Technology and the Implications for Regulation," Working Paper 17-042 Harvard Business School,   p. 39, https://www.hbs.edu/ris/Publication%20Files/17-042_30393d52-3c61-41cb-a78a-ebbe3e040e55.pdf   (last accessed 4/1/22) (distinguishing between MCAs and receivables financing).

459 F.3d 220 (2d Cir. 2006) (citing *Estate of Mixon v. United States*, 464 F.2d 394, 405 (5th Cir.

1972) ("If there is a definite obligation to repay the advance, the transaction [will] take on some

indicia of a loan."); *Rosenberg v. Commissioner*, T.C. Memo 2000-108, 79 T.C.M. (CCH) 1769

(2000) ("A taxpayer's right to enforce repayment of an advance suggests that the advance is a

loan.")).

59.    In distinguishing a sale from a loan, the conduct and intent of the parties is

instructive:

> A sale is the transfer of the property in a thing for a price in money.
> The transfer of the property in the thing sold for a price is the essence
> of the transaction. The transfer is that of the general or absolute
> interest in property as distinguished from a special property interest.
> A loan, on the other hand, is the delivery of a sum of money to
> another under a contract to return at some future time an equivalent
> amount with or without an additional sum agreed upon for its use;
> and if such be the intent of the parties the transaction will be deemed
> a loan regardless of its form. Emphasizing the necessity of
> appraising the transaction as disclosed by the evidence as a whole
> rather than by what the transaction appears or is represented by
> the parties to be, we observed that "all of the negotiations,
> circumstances and conduct of the parties surrounding and connected
> with their contracts may be material in determining whether the
> form thereof covered an intent to violate the usury law . . . ."

*West Pico Furniture Co. v. Pacific Fin. Loans*, 469 P.2d 665, 671-72 (Cal. 1970); *see also Endico*

*Potatoes,* 67 F.3d at 1068 ("Resolution of whether the 'contemporaneous transfer,' as CIT

describes Merberg's assignment of accounts receivable to CIT and CIT's loan advances to

Merberg, constitutes a purchase for value or whether the exchange provides CIT with no more

than a security interest, depends on the substance of the relationship between CIT and Merberg,

and not simply the label attached to the transaction."); *Adar Bays*, *LLC v. GeneSYS ID, Inc*., 37

N.Y.3d 320, 334 (2021) ("When determining whether a transaction is a loan, substance—not

form—controls."); *Bouffard v. Befese, LLC*, 111 A.D.3d 866, 869 (2d Dep't 2013) ("In

determining whether a transaction is usurious, the law looks not to its form, but its substance, or real character" and being a "hard money lender" to those "unable to obtain conventional financing" is nothing more than "plainly usurious" lending).

60.     To avoid state usury laws, an MCA agreement purports to be a sale of a merchant's future receivables.  This device is not novel.  As early as the time of Lord Mansfield, it was recognized that "the most usual form of usury was a pretended sale of goods." *Quackenbos v. Sayer*, 62 N.Y. 344, 346 (1875); *see also Aardwoolf Corp. v. Nelson Capital Corp.*, 861 F.2d 46, 47 (2d Cir. 1988) ("At the outset, we lay to rest any question there may be as to the nature of the so-called 'discount.' It was, as the parties concede, the taking of interest in advance, a practice as old as the proverbial hills.") (citing *Evans v. National Bank*, 251 U.S. 108, 113 (1919)).  *See also Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 342 (2021) (a common tool of lenders in the 1800s to avoid enforcement of usury law penalties—civil or criminal—was to disguise the loan as a sale).

61.     Accordingly, as explained by Chief Justice John Marshall nearly 200 years ago, courts must look beyond the form to ascertain its true nature:

> The ingenuity of lenders has devised many contrivances, by which under forms sanctioned by law, the statute may evaded. . . Yet, it is apparent, that if giving this form to the contract will afford a cover which conceals it from judicial investigation, the statute would become a dead letter.  Courts, therefore, perceived the necessity of disregarding the form, and examining into the real nature of the transaction.

*Scott v. Lloyd*, 34 U.S. 418, 9 L.Ed. 178 (1835).

62.     In a true sale, the seller retains no benefits of ownership with respect to the subject assets transferred, the risk of loss with the subject assets is wholly transferred to the buyer, and the seller maintains no control over the assets.  *See NetBank, FSB v. Kipperman (In Re Commer. Money Ctr. Inc.)*, 350 B.R. 465 (9th Cir. 2006) (finding transaction to be a loan rather than a sale

where seller/assignor retained right to surplus proceeds); *In re Evergreen Valley Resort,* 23 B.R. 659, 661 (D. Me. 1982) (recognizing that a loan "is indicated if the assignee must account to the assignor for any surplus received from the assignment over the amount of the debt" rather than retaining such surplus as the benefits of ownership); *In re Hurricane Elkhorn Coal Corp. II*, 19 B.R. 609, 614 (W.D. Ky. 1982) (finding transaction was a loan because debtor retained right to use proceeds in excess of amount advanced).

63.     In other words, in a true sale, "the benefits and burdens of ownership" pass from the seller to the buyer.  *See JMW Auto Sales, Ltd. v. FT Dev. Inc. (In re Moye),* 2010 Bankr. LEXIS 4378 (S.D. Tex. 2010) (holding agreement "did not evidence a consummated transfer of the benefits and burdens of ownership" so as to constitute a true sale); *Callow v. Comm'r,* 135 T.C. 26, 33-34 (U.S. Tax Ct. 2010) ("[T]he key to deciding whether the transaction was a sale or other disposition is to determine whether the benefits and burdens of ownership have passed" from seller to buyer.).

64.     Generally recognized principles of accounting similarly focus on the transfer of ownership in determining whether a transaction must be accounted for as a sale or a loan.  In order to be accounted as a sale, three requirements must be met:  "First, the transferred financial assets must have been put beyond the reach of the transferor and its creditors. Second, the transferee must have the right to pledge or exchange the asset free of conditions. Third, the transferor must not maintain effective control over the asset." *MF Global Holdings, Ltd. v. PricewaterhouseCoopers LLP*, 199 F. Supp. 3d 818, 824 (S.D.N.Y. 2016).  None of these factors is met in an MCA agreement.

65.     As explained by the Second Circuit in distinguishing a loan from a sale:

> Such transactions are somewhat ambiguous and admit of definition
> as loans or sales on slight differences. If a merchant discounts his

customer's note at a bank, endorsing it, but getting immediate credit for its discount value, it would be a most unnatural thing to consider it a loan from the bank. He remains liable if the customer defaults, but the collection is in the bank's hands, and the transaction is closed in the absence of a default. If, on the other hand, a merchant pledges his accounts to a 'finance' company and collects them himself, paying the loan out of his collections, it is clearly a loan, and has always been so considered.

*Elmer v. Commissioner*, 65 F.2d 568 (2d Cir. 1933); *see also In re Gotham Can Co.*, 48 F.2d 540 (2d Cir. 1931); *Home Bond Co. v. McChesney*, 239 U.S. 568 (1916).

### B.     The mechanics of an MCA agreement.

#### 1.     The Factor Rate.

66.     The factor rate is the amount charged for the time value of the money being lent. In an MCA agreement, it is the difference between the Purchase Price and the Purchased Amount. The factor rates are typically between 1.3 and 1.49.  Thus, if the advance is $100,000, and the factor rate is 1.49, the Purchase Price would be $100,000 and the Purchased Amount would be $149,000.  Put another way, the MCA company is charging $49,000 for the time value of the money advanced.

#### 2.     The Daily Payment Amount.

67.     Under a legitimate MCA agreement, an MCA company would review a merchant's past three to four months of bank statements to determine the merchant's average monthly receivables.  A legitimate MCA company would then divide that average monthly revenue by twenty two (the number of business days in a month) to come up with a good-faith daily payment. The MCA company would then multiply the percentage of receivables purchased, typically 10% to 25%, by the daily average to come up with the amount that will be debited each day.

> **Example:**  If the average monthly receivables equal $100,000, then the merchant's average daily receivables is $4,545 ($100,000 divided by 22).  If the MCA company was purchasing 10% of the merchant's receivables, then the good-faith estimated payment should be $454 ($4,545 x .10).

-14-

### 3.     The Interest Rate.

68.     The interest rate of an MCA loan can be determined by the face of the agreement. To determine the payback term, one simply divides the payback amount, i.e., the Purchased Amount, by the Daily Payment.  In the two examples above, if the Purchased Amount is $149,000 and the estimated Daily Payment is $454, then the total number of daily payments is 328, which equates to approximately 65 weeks.  When adding two days for each week to account for Saturdays and Sundays when no payments are withdrawn, the total expected term is 459 days.   To determine the interest rate, one then has to identify the annualized interest rate, which is determined by dividing the interest charged by the sum advanced.  In the examples above, one divides $49,000 by $100,000, which results in an annualized interest rate of 49%.  To determine the interest rate for the specific transaction, one multiplies the annualized interest rate by 365 days in year and then divides that number by the total days of the term.  In the example above, the simple interest rate would be 39% (.49 x 365 = 178.85 and 459 days divided by 178.5 = .388).

### 4.     The Reconciliation Provision.

69.     In order to give the appearance of risk, almost all MCA agreements contain a so-called "reconciliation" provision.  Unlike the agreements here, the way it is supposed to work is, at the end of the month, a merchant has the right to provide a copy of its bank statements to the MCA company and request a reconciliation.  If the amount collected through the Daily Payments exceeds the percentage of receivables allegedly purchased, the MCA company is required to provide a refund of any excess amounts collected.  To put this in simplest terms, if the business generated no receipts and the MCA company collected $10,000 through the Daily Payments, the MCA company is required to refund the entire $10,000 because 10% of zero is zero.  The superficial effect of this reconciliation provision allows the MCA company to claim that, unlike a

-15-

loan, it is assuming the risk of nonpayment.  It also allows it to assert that the repayment term is indefinite so there can be no violation of the usury laws.

### 5.    The Personal Guarantee and Confession of Judgment.

70.    In a legitimate factoring agreement, a purchaser does not have recourse against the seller if the account debtor does not pay.  Rather, that is a risk assumed by the purchaser.  In other words, if a factoring company purchases a receivable owed by ABC company to the seller, and ABC company goes bankrupt or otherwise fails to pay, the factoring company does not get paid and has no recourse against the seller of those receivables.  *See, e.g., Burm v. Johnson (In re Burm)*, 554 B.R. 5, 16 (D. Mass. 2016) (holding transaction was true sale because buyer had no recourse against seller in the event of non-payment).

71.    That is not the case with a typical MCA agreement. Rather. MCA agreements contain a personal guarantee, wherein the individual owner guarantees certain performance under the MCA agreement.  In addition, the vast majority of MCA agreements require a merchant to execute a confession of judgment, permitting the MCA company to obtain a judgment against both the small business and its individual owner in the event of a default.  And upon default, the confession of judgment almost always includes liquidated attorney's fees between 25% and 33% of the outstanding balance.

## BACKGROUND ON THE MCA INDUSTRY

### A.    The Predatory MCA Industry.

72.    The MCA Industry spawned from the 2008 Financial Crisis. One of the earliest MCA companies, Yellowstone Capital LLC, was co-founded in 2009 by David Glass, an inspirational character for the movie "Boiler Room."[2] As Mr. Glass confessed to Bloomberg News,

---

[2] https://www.sec.gov/litigation/admin/2008/34-58574.pdf

"it's a lot easier to persuade someone to take money than to spend it buying stock." Just like in the movie, MCA companies utilize high-pressure boiler room tactics, employing salespersons with absolutely no financial background whatsoever.

73.     As Bloomberg previously reported, the MCA Industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[3]  The MCA Industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy." *Id.*  As one of these brokers admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage.  There's no license you need to file for.  It's pretty much unregulated." *Id.*

**B.     The Sham.**

74.     Many states, like New York, have laws prohibiting the predatory interest rates. In order to evade these criminal usury laws, MCA companies disguise their agreements as "purchases of future receivables."   MCA companies promote a fiction that, rather than making loans to merchants, they are purchasing, at a discount, a fixed amount of the merchant's future receivables, usually to be repaid through a fixed daily or weekly payment that purportedly represents a percentage of the merchant's receipts.  The form of the contract thus allows MCAs to represent to courts that they, not the merchants, assume the risk that the merchants will fail to generate receivables. But the picture they paint is contrary to reality. By operation of their agreements' default rights and remedies, the MCA companies exert complete control over the relationship and compel their merchants to make the fixed payments or suffer the consequences.

---

[3] https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.

28885517v.2

C.     **The Bloomberg Awakening.**

75.     For nearly a decade, MCAs operated under the radar of regulators, compiling over 25,000 confessions of judgment against small businesses and their individual owners. That all changed on November 20, 2018 when Bloomberg News and renowned journalist Bethany McLean published what would be the first in a series of groundbreaking news articles exposing the abuses of the predatory MCA industry.[4]

76.     As a direct result of the light shined on these abuses, the New York Legislature quickly enacted legislation extinguishing their weapon of mass destruction, the confession of judgment, expressly citing the Bloomberg articles as its inspiration.

77.     Congress also took notice. On June 26, 2019, the United States House of Representatives held a hearing titled: "Crushed by Confessions of Judgment: the Small Business Story."[5]  As explained by Professor Hosea Harvey, a contracts expert from Temple University, small businesses are just as susceptible to predatory lending as unsophisticated individuals.[6]

78.     Regulators have also taken action. On July 31, 2020, the New York Attorney General brought suit against a group of MCA companies, as well as their principals, alleging that their MCA agreements constitute criminally usurious loans.[7]

79.     On July 31, 2020, the Securities and Exchange Commission shut down an MCA company. In its complaint, the SEC alleged that Par Funding "made opportunistic loans, some of

---

[4] *https://www.yahoo.com/entertainment/merchant-cash-advances-salvation-small-businesses-payday-lending-reincarnate-161835117.html*
[5] https://www.congress.gov/event/116th-congress/house-event/LC64251/text?s=1&r=60.
[6] *See id.*
[7] https://ag.ny.gov/press-release/2020/attorney-general-james-sues-predatory-lender-threatened-violence-and-kidnapping

which charged more than 400% interest, to small businesses across America."[8] The FBI thereafter raided its offices, confiscating a cache of guns, millions of dollars in cash, and a private airplane.[9]

80.     On August 3, 2020, the Federal Trade Commission filed a complaint against Yellowstone.[10] Notably, the FTC complained that Yellowstone "unlawfully withdrew millions of dollars in excess payments from their customers' accounts, and to the extent they provided refunds, sometimes took weeks or even months to provide them." *Id.*

81.     On November 10, 2020, the California Commission of Financial Protection and Innovation entered into a Consent Order with Allup Financial LLC, finding that its MCA agreements were lending transactions subject to the California Finance Lenders Law, and barring the MCA company from doing business in California unless and until it complies with its laws.[11]

82.     On December 8, 2020, the New Jersey Attorney General also filed suit against Yellowstone, alleging it cheated "financially-strapped small businesses and their owners out of millions of dollars nationwide by luring them into predatory loans disguised as cash advances on future receivables with interest rates far exceeding the interest rate caps in the State's usury laws."[12]

83.     On December 23, 2020, New York signed into law the Small Business Truth in Lending Law, which is aimed at "protecting small business owners," and "requires key financial

---

[8] https://www.sec.gov/litigation/litreleases/2020/lr24860.htm
[9] https://www.inquirer.com/news/par-funding-better-financial-plan-joseph-laforte-dean-vagnozzi-20200731.html
[10] https://www.ftc.gov/news-events/press-releases/2020/08/ftc-alleges-merchant-cash-advance-provider-overcharged-small
[11] https://dfpi.ca.gov/wp-content/uploads/sites/337/2020/11/Consent-Order-Allup-Finance-LLC.pdf.
[12] https://www.njoag.gov/ag-grewal-files-suit-against-yellowstone-capital-llc-and-associated-companies-alleging-the-merchant-cash-advance-companies-targeted-small-businesses-with-predatory-lending-and-abusive-collection-pract/

terms such as the amount financed, fees and annual percentage rate (APR) to be disclosed at the time a credit provider or broker makes an offer of financing of $500,000 or less."[13]

84.     As Gretchen Morgensen of NBC News recently reported, however, the financial greed of predatory lenders, like Counterclaim Defendants, has only accelerated in the wake of Covid-19.[14]

### D.     The Sea Change in Law.

85.     Prior to the Bloomberg Awakening, courts routinely rejected attempts by small business victims seeking to vacate the many thousands of confessions of judgments filed by MCA companies.  Courts primarily denied those attempts on the procedural basis that a plenary action must be filed instead of merely seeking to vacate by motion.  One court went so far as to sanction the attorney for even bringing the motion.  *See, e.g., Yellowstone Capital LLC v. Central USA Wireless LLC*, 2018 N.Y. Misc. LEXIS 2516, *2 (N.Y. Sup. Ct., Erie Cty Jun. 25, 2018) (citing *Yellowstone Capital, LLC v. Jevin*, Index No. 802457/2017 (N.Y. Sup. Ct. Erie Co. Oct. 6, 2017)).

86.     The tide has since turned in the wake of the Bloomberg articles.  Most notable is the decision by Judge Nowak, a Commercial Division Justice out of Erie County—a favorite forum for MCAs given Upstate New York's more conservative political leanings. *See McNider Mar., LLC v Yellowstone Capital, LLC*, 2019 N.Y. Misc. LEXIS 6165 (N.Y. Sup. Ct., Erie Cty Nov. 19, 2019). Notably, Judge Nowak reversed his own prior decision in *Yellowstone Capital, LLC v. Jevin*, *supra*, where he previously held that the very same Yellowstone agreement was not a loan as a matter of law. This time, upon further reflection, Judge Nowak not only upheld the claims of usury, but also upheld the RICO claims.  Numerous courts have followed suit.  *See, e.g., Davis v.*

---

[13] https://www.jdsupra.com/legalnews/gov-cuomo-signs-new-york-small-business-9450503/
[14]     https://www.nbcnews.com/business/economy/feds-crack-down-lenders-targeting-small-businesses-high-interest-loans-n1236167, Aug. 11, 2020.

*Richmond Capital Group*, 194 A.D.3d 516 (1st Dept. 2021); *NRO Boston LLC v. Yellowstone Capital LLC*, 2021 N.Y. Misc. LEXIS 1892 (Rockland Cty, April 9, 2021) (upholding RICO claims); *LG Funding LLC v. United Senior Properties of Olathe LLC,* 122 N.Y.S.3d 309 (2d Dep't. 2020); *Matter of AH Wines Inc., v. C6 Capital Funding LLC*, 2020 N.Y. Misc. LEXIS 4642 (N.Y. Sup. Ct. Ont. Cty. Aug. 19, 2020); *American Resources Corp. v. C6 Capital, LLC*, 2020 N.Y. Misc. LEXIS 10725, *6 (N.Y. Sup. Ct., Kings Cty. Dec. 16, 2020); *Funding Metrics LLC v. NRO Boston*, 2019 N.Y. Misc. LEXIS 4878 (N.Y. Sup. Westch. Cty. Aug. 28, 2019); *Funding Metrics, LLC v. D & V Hospitality*, 62 Misc.3d 966 (N.Y. Sup. Westch. Cty. Jan. 7, 2019).

87.     Numerous federal courts have also joined the revolution. *See Fleetwood Servs., LLC v. Ram Capital Funding LLC*, 2021 U.S. Dist. LEXIS 94381 (S.D.N.Y. 2021) (upholding RICO claims under MCA agreement); *Fleetwood Servs., LLC v. Complete Bus. Sols. Grp.*, 374 F.Supp.3d 361 (E.D. Pa. 2019) (same); *NRO Boston v. Funding Metrics*, 2018 U.S. Dist. LEXIS 239152 (E.D. Pa. May 23, 2018) (same); *Davis v. Richmond Capital Group*, 194 A.D.3d 516 (1st Dept. 2021); *NRO Boston LLC v. Yellowstone Capital LLC*, 2021 N.Y. Misc. LEXIS 1892 (Rockland Cty, April 9, 2021) (upholding RICO claims).

88.     So has New York's highest court. *See Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 2021 NY Slip Op 07055, 11, 2021 WL 5926893 (N.Y. Dec. 16, 2021).

## **SUMMARY OF WORK PERFORMED AND FEES EARNED**

89.     As demonstrated above, Tracer Roofing and its owner, Nicole Carpenter, are victims of the MCA industry.

90.     They were preyed upon the industry at a time when Tracer Roofing was at its most desperate.  As a direct result of the pandemic, Tracer Roofing incurred unexpected cost increases

for materials.  Prior to the inflationary pressures caused by the pandemic, it was a profitable business and had strong revenues with over a billion dollars of future contracts worth saving.

91.     Despite these predatory loans, I believed in good-faith that I would be able to resolve Tracer Roofing's MCA debt if it obtained the anticipated financing through an investor or future SBA or EIDL loan.  A recent decision by the Texas District Court denying a summary judgment motion filed by Austin Business Finance, LLC, an MCA Company, against Ms. Carpenter shows that the Debtor and Ms. Carpenter have meritorious defenses to the claims asserted by the MCA Companies.  A copy of the Order Denying Austin Business Finance's Motion for Summary Judgment is attached as Exhibit F.

92.     Given the Debtor and Ms. Carpenter's anticipated need to defend against these looming MCA lawsuits, which was discussed with Ms. Carpenter from day one, Ms. Carpenter sent $25,000 to W&W towards a retainer from her personal account on August 26, 2021.  On September 15, 2021, the Debtor sent W&W $150,000 towards a retainer.  On September 22, 2021, Ms. Carpenter sent an additional $80,000 to W&W from her personal account.  The bank transaction information for the wire transfers is attached hereto as Exhibit G.

93.     Up until the filing of the bankruptcy petition, White and Williams LLP explored all options, including a proposed UCC-9 sale by Libertas, Tracer Roofing's purported senior secured MCA lender.

94.     Once Tracer Roofing's various options were exhausted, White and Williams LLP recommended that Tracer Roofing seek bankruptcy protection and liquidate the business through a Chapter 11 proceeding.

95.     Shortly after the filing of the Chapter 11 proceeding was filed, the United States Trustee moved to convert the Chapter 11 proceeding to a Chapter 7 liquidation proceeding, which was granted by this Court.

96.     The U.S. Trustee now seeks to disgorge the fees charged by White and Williams LLP as excessive.

97.     As previously stated, the time value in our billing system for this matter exceeds $250,000, and the amount actually applied to our bills is just over $180,000.  A copy of the W&W invoices for fees prior to the Petition Date are attached hereto as Exhibit H.

98.     This matter is highly complex both factually and legally.  In addition to involving highly specialized legal issues, the number of transactions, contracts, bank statements, and bookkeeping records were, to put it mildly, challenging.

99.     For of these reasons, I respectfully submit that the fees charged by White and Williams LLP were reasonable and necessary at all relevant times, and that White and Williams LLP performed to the best of its abilities under the unique factual circumstances of this case.


[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

28885517v.2

DATED:       May 31, 2022

**WHITE AND WILLIAMS LLP**

By: _____

Shane R. Heskin
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA 19103
(215) 864-6329
heskins@whiteandwilliams.com